IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HELEN ANN MANGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14 C 3615 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Helen Ann Mangan, seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") insofar as it found that although she was disabled beginning on July 1, 2012, she was not disabled from the alleged onset date of her disability on April 30, 2011, through June 30, 2012 (doc. # 24). The Commissioner filed a motion seeking affirmance of the decision denying benefits for the period from April 30, 2011 through June 30, 2012 (doc. # 29). For the following reasons, we grant Ms. Mangan's motion and deny the Commissioner's motion.

I.

Ms. Mangan applied for benefits on May 11, 2011, at age 28, alleging she became disabled on April 30, 2011, due to asthma, multiple sclerosis ("MS"), and severe pain (R. 57).[2] She has not worked at a level of substantial gainful activity since at least 2008 (R. 181). After a video hearing on October 16, 2012, the Administrative Law Judge ("ALJ") issued a partially

---

[1]On June 10, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

[2]Ms. Mangan was consistently prescribed albuterol for her asthma. There is no indication in the medical record that she suffered complications from her asthma (R. 319, 361).

favorable decision, finding that Ms. Mangan became disabled due to MS on July 1, 2012, but denying her benefits before that date. The Appeals Council denied review, and Ms. Mangan now appeals the ALJ's finding that she was not disabled for a closed period from April 30, 2011 through June 30, 2012. Because the Appeals Council denied review, we review the ALJ's decision as the final word of the Commissioner. *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

## II.

The relevant medical record begins in November 2009, when Ms. Mangan underwent an abnormal MRI test that was consistent with MS. That month, she presented to neuro-ophthalmologist Dr. James Pula with optic neuritis (inflammation of the optic nerve) in her right eye, which caused her temporary right eye blindness (R. 284). She was started on Betaseron (an injection to treat MS) and was "doing well" as of March 2010, with her optic neuritis resolved (*Id.*).

Ms. Mangan continued to treat with Dr. Pula. Throughout 2010, Dr. Pula wrote that Ms. Mangan had "no new MS attacks"[3] and her walk, balance and mood were good; however, in June 2010, Ms. Mangan developed an episodic burning sensation in the middle of her back, occasional numbness in her arms, legs and left side, and neck and back pain, for which she took Vicodin (R. 320). Ms. Mangan also suffered severe headaches, which were not relieved with medication (*Id.*). In January 2011, Dr. Pula reported that Ms. Mangan was stable on Betaseron (*Id.*). She was taking Vicodin on an as-needed basis for back pain, and her walking and balance were "good," though she was fatigued and still suffered from occasional headaches (*Id.*).

In February 2011, Ms. Mangan visited her primary care physician, Jennifer Tieman, M.D. Dr. Tieman noted that Ms. Mangan complained of low back pain, and while her range of motion

---

[3] The phrase "MS attacks," as used in Dr. Pula's reports, is never defined in the record.

2

was full, she experienced tingling in her low back and upper thighs when bending forward (R. 304). In March 2011, Dr. Tieman observed that Ms. Mangan's lateral bending and twisting range of motion was limited, with paraspinal spasm and tenderness on the right side (R. 302).

On May 16, 2011, in conjunction with her claim for benefits, Ms. Mangan completed a Function Report. She reported severe memory loss, joint pain, problems walking, severe headaches and severe pain throughout her body (R. 209). Ms. Mangan wrote that she does not carry things or do housework due to pain, weakness and numbness in her legs and arms (R. 210-13). In addition, she wrote that she is fatigued and sleeps most of the day, can only sit for about five to ten minutes due to severe back pain, and only goes outside a "couple times a week," to grocery shop or visit the doctor (R. 218-19).

On July 16, 2011, Patricia Russell, M.D., conducted an Internal Medicine Consultative Examination of Ms. Mangan for the Bureau of Disability Determination Services ("DDS"). At the appointment, Ms. Mangan complained of severe headaches, sharp back pain which radiated to her neck and lower spine, and numbness in her upper extremities and legs (R. 322-23). Ms. Mangan believed her headaches were a side effect of Betaseron (R. 322). Ms. Mangan reported that she could only stand for ten minutes, and though she could walk a block, she fell frequently in high humidity (R. 323). Dr. Russell observed that Ms. Mangan had some neck pain and back tenderness, with some limits in her neck range of motion and mild weakness in her fine motor movements, but otherwise her movement was within normal range and she had a non-antalgic gait (R. 324-25). Dr. Russell noted that an MRI showed a small focal disc herniation at L5-S1 with disc desicccation (R. 323). Dr. Russell also commented that Ms. Mangan was alert, oriented and cooperative, with normal affect and no signs of depression, agitation or anxiety (R. 325).

3

On July 26, 2011, Calixto Aquino, M.D., completed a physical residual function capacity ("RFC") assessment of Ms. Mangan for DDS, based on the medical record. He found that Ms. Mangan was capable of occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds, standing and/or walking and sitting for a total of six hours in an eight-hour workday, and unlimited pushing and pulling, with no manipulative, visual, or communicative limitations (R. 61-62). Dr. Calixto opined that Ms. Mangan was not disabled and could perform her past relevant work as a packer (R. 63).

In August 2011, Ms. Mangan reported to Dr. Pula continued numbness in her hands and legs, but no further MS attacks, along with fatigue and cognitive and memory problems (R. 370). Dr. Pula wrote that Ms. Mangan was no longer able to tolerate the pain and side effects of any MS-treatment injections, and he prescribed Gilenya (an oral medication) to treat her MS and prevent further MS attacks (*Id.*). Illinois Medicaid initially denied coverage for Gilenya therapy for Ms. Mangan, in response to which Dr. Pula sent a letter detailing Ms. Mangan's medical history, including that after multiple trials, she was shown to be "completely intolerant of the injections and can no longer take injectable immunomodulatory MS shots" (R. 369). Dr. Pula explained that the only oral FDA-approved disease modifying medication for MS is fingolimod (Gilenya), and "she absolutely requires an MS medication to prevent further attacks" (R. 369). He wrote that Ms. Mangan's future without Gilenya would be "devastating and would result in an enormous burden physically, mentally, and economically" (*Id.*). Ms. Mangan was ultimately approved to receive the medication, and on November 16, 2011, Ms. Mangan had her first dose of Gilenya without complications (R. 362).

In September 2011, Ms. Mangan completed additional disability and function reports for DDS, stating that her pain, numbness and memory loss were worsening such that she could not

4

stand for more than five minutes or lift a gallon of milk (R. 222, 231). She wrote that she sleeps all day due to fatigue and does not "have the strength to do anything" (R. 225, 231). Ms. Mangan reported that her boyfriend does everything for her, that she only shops one time per month, and she only goes outside a few times per week (R. 232-35). That month, Ms. Mangan's mother completed a Third Party Function Report, which stated that Ms. Mangan's friend makes all of her meals and does all of her chores because Ms. Mangan "has a hard time doing anything because of pain" (R. 242-43, 245).

On November 8, 2011, licensed clinical psychologist Dr. Mark B. Langgut, Ph.D., conducted a Psychological Assessment of Ms. Mangan for DDS. He reported that Ms. Mangan presented as "cognitively dull with a constricted affect and was somewhat tearful at times" (R. 345). Her eye contact was fair and she was alert and oriented with clear, though slowed, speech (*Id.*). Ms. Mangan described the presence of mild depression with depressive symptoms of hopelessness, lethargy, sleep problems and irritability (R. 347). Dr. Langgut observed that Ms. Mangan's emotional presentation "was blunted" and her activity during the interview ranged from hypoactive to normal (*Id.*). He also noted that Ms. Mangan showed "variable memory and mental abilities" and "deficient" computational skills (*Id.*). Dr. Langgut opined that she "may have significant difficulty" forming generalizations and understanding concepts, and she has "unreliable judgment" (R. 347-48). Ms. Mangan also reported that she experienced "somewhat clouded consciousness, difficulty with logical thoughts and is easily confused" (R. 348). Dr. Langgut observed that her thought processes were characterized by slowed speed and average coherence, and she had difficulty shifting topics (*Id.*). He opined that Ms. Mangan had "dysthymic disorder," and "mentally deficit intellectual functioning-estimated" (*Id.*).[4]

---

[4] Dysthymic disorder is a mild but chronic form of depression. http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879.

On November 29, 2011, at the request of DDS, Linda Lanier, Ph.D., evaluated Ms. Mangan's mental RFC based on the medical record. Dr. Lanier opined that Ms. Mangan suffered from non-severe affective disorders, and did not meet Listing 12.02, organic mental disorders, or Listing 12.04, affective disorders (R. 70). Dr. Lanier found that Ms. Mangan had moderate restriction in activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation, each of extended duration (*Id.*). Due to moderate limitations in understanding, remembering and carrying out detailed instructions, Dr. Lanier stated that Ms. Mangan should be limited to one to two-step tasks (R. 74-75). Dr. Lanier also found that Ms. Mangan had sustained concentration and persistence limitations and that her "limited IQ suggests difficulty sustaining attention to detailed tasks" (*Id.*).

On December 5, 2011, Henry Rohs, M.D., reconsidered Dr. Aquino's physical RFC assessment in light of additional physical evidence, including Ms. Mangan's complaints of constant numbness in her arms and legs, severe memory loss and significant fatigue (R. 67, 70). Dr. Rohs found that Ms. Mangan had the same physical RFC as previously determined by Dr. Aquino, and could perform her previous work as a packer (R. 71-73, 76).

Sometime between July 2011 and February 2012, Ms. Mangan started taking medication for depression. On February 23, 2012, Dr. Pula reported that Ms. Mangan had already tried various medications for depression, including Citalopram, buproprion, and Xanax, but she was still depressed (R. 365). Ms. Mangan reported that her memory problems persisted; she told Dr. Pula that she had forgotten her kids at school (*Id.*). In addition, she was taking Norco for pain, but her pain was not well-controlled (R. 365-66). She also had fallen several times from imbalance (R. 365).

6

On July 11, 2012, Dr. Pula documented that Ms. Mangan's memory and depression had not improved, despite medication, and she would try Cymbalta next (R. 361-62). Ms. Mangan's balance problems had worsened, and she had fallen several times (R. 362). On July 16, 2012, Ms. Mangan underwent another brain MRI, which showed possible worsening of her MS as compared with the November 2009 MRI (R. 383).

On October 15, 2012, Dr. Pula reported that Ms. Mangan continued to have problems with balance, cognition, memory, headaches and chronic back pain (R. 397). In addition, he noted that she had leg pain, ambulated slowly and had fallen three times (R. 398). Dr. Pula also noted plans for Ms. Mangan to try Effexor, another medicine for depression (*Id.*).

### III.

At the video hearing before the ALJ on October 16, 2012, Ms. Mangan reiterated that she suffered from persistent severe back pain, headaches, leg pain and memory problems (R. 418-24). She testified that she could sit about ten to fifteen minutes at a time, could stand for "not even five minutes," and was more comfortable lying down (R. 421). Further, Ms. Mangan testified that her husband,[5] her sister and her children (ages five, nine, ten and twelve) did the chores around the house, because she was unable to do anything due to the severity of her pain (R. 422-23). Ms. Mangan also testified that her sister helped her kids get ready and go to school, prepared meals, and took care of her youngest child while her husband was at work (R. 427).

A medical expert ("ME"), Ashok Jilhewar, M.D., doctor of internal medicine and gastroenterology, also testified at the hearing (R. 429). Dr. Jilhewar divided Ms. Mangan's impairments into two time periods, April 30, 2011 through October 1, 2011, and November 1,

---

[5]Other documents in the record referred to Ms. Mangan's "boyfriend."

7

2011 through the date of the hearing (R. 433).[6] Prior to November 2011, Dr. Jilhewar opined that Ms. Mangan was "able to do sedentary capacity" work, with frequent use of her upper extremities and some additional postural, manipulative and environmental limitations, based on the July 16, 2011 consultative examination (R. 433-34). Dr. Mangan found important that at least as of February 2011, Ms. Mangan had a normal gait (R. 436-37).

Dr. Jilhewar opined that Ms. Mangan met the criteria for Listing 11.09-C (for MS) during the second time period. He chose November 2011 as the start date because that is when Ms. Mangan began taking Gilenya (R. 433-34).[7] Dr. Jilhewar noted, however, that he was missing notes from Ms. Mangan's visits with Dr. Pula from the onset date until July 11, 2012, and thus he did "not have office visit details of November 2011 in the medical record" (R. 432-34).

The ALJ responded with concern as to this start date for Ms. Mangan's disability, stating: "But, we have no medical records? No clinical exams? Nothing else." (R. 434). The ME replied that his "expectation" was that there would be additional signs of impairment on the date Ms. Mangan began taking Gilenya, but that "if you [the ALJ] do not wish to accept that opinion, then the equaling of the listing is from 7/11/2012" (R. 435). On that date, July 11, 2012, Dr. Pula's records showed that Ms. Mangan had worsening balance, fatigue, memory and cognitive problems (R. 431-32). In addition, Ms. Mangan's MRI from July 2012 MRI showed worsening MS changes as compared to the November 2009 MRI (R. 432).[8]

The vocational expert ("VE") testified next. The VE noted that although Ms. Mangan had several past occupations, including cashier checker and packer, she never performed any of the

---

[6]No explanation was sought or given for the one-month gap in these time periods.

[7]Dr. Jilhewar does not explain why he used the date Ms. Mangan began taking Gilenya (after the initial denial by Illinois Medicaid), rather than the earlier date (August 2011) when Dr. Pula prescribed it.

[8]Dr. Jilwehar also noted that the record indicated that Ms. Mangan suffered from other, less serious impairments including mild obesity and "dysthymic disorder and mentally deficient intellectual functioning," but that he did "not know the meaning of that impairment" (R. 432-33).

8

jobs at the substantial gainful activity level (R. 439). Nevertheless, the VE stated that a hypothetical claimant of Ms. Mangan's age, education and work experience who would be limited to sedentary work with frequent handling and fingering could perform jobs at the unskilled, sedentary level (R. 439-40).

## IV.

On October 26, 2012, the ALJ issued a written decision finding Ms. Mangan not disabled prior to July 1, 2012, and denying her benefits before that date. At Step 1 of the five-step process for determining disability, *see* 20 C.F.R. § 416.920(a), the ALJ determined that Ms. Mangan had not engaged in any substantial gainful employment since the alleged onset date of April 30, 2011 (R. 23). At Step 2, the ALJ found that since the alleged onset date, Ms. Mangan had the following severe impairments: relapsing and remitting MS, obesity, headaches and low back pain (*Id.*). The ALJ stated that she also had non-severe asthma, which was relatively controlled (*Id*).

At Step 3, the ALJ determined that none of Ms. Mangan's impairments individually or combined met or medically equaled a Listing prior to July 1, 2012 (R. 23). *First*, the ALJ found that Ms. Mangan's mild obesity did not combine with her other impairments to meet the threshold for any listing since she could "ambulate appropriately without assistance" (R. 24). *Second*, the ALJ found that Ms. Mangan's back pain did not meet Listing 1.04 (disorder of the spine) because she ambulated effectively without any assistive devices, tested negatively on a straight leg raising test, and exhibited a normal gait (*Id.*). The ALJ found that Ms. Mangan also did not meet Listing 3.03 (asthma) because her symptoms responded well to inhaled Albuterol and she had never been hospitalized for asthma (*Id.*). *Third*, the ALJ found that Ms. Mangan's symptoms were not severe enough to qualify for Listing 11.09 (multiple sclerosis) prior to July 1, 2012 (*Id.*). To support this determination, the ALJ relied on the July 16, 2011, internal medical

9

examination by Dr. Russell (R. 24). *Fourth*, the ALJ found that Ms. Mangan did not have a visual impairment that met the criteria of Listings 2.02, 2.03 or 2.04, because her visual acuity was normal and her optic neuritis had resolved (R. 24-25).

The ALJ then addressed Ms. Mangan's mental health.[9] She found that Ms. Mangan did not have a severe mental health impairment (R. 25). The ALJ reviewed Dr. Langgut's findings and observations, but questioned his diagnosis of deficient intellectual functioning because it was not based on intelligence testing or educational records (*Id.*). The ALJ gave "some weight" to Dr. Lanier's opinion, explaining that Dr. Lanier's findings that Ms. Mangan had non-severe affective disorder was "inherently inconsistent" with Dr. Lanier's opinion that Ms. Mangan had moderate limitations in concentration, persistence or pace (R. 26).

The ALJ concluded that Ms. Mangan had mild functional limitations and no episodes of decompensation (R. 25) -- without acknowledging that Dr. Lanier reported that Ms. Mangan had experienced one or two episodes of decompensation of extended duration (R. 70). The ALJ stated that her determination was "supported by the limited treatment by claimant's primary care physician only without any treatment from any psychologist or psychiatric specialist" (*Id.*). The ALJ noted that Ms. Mangan was alert and oriented with no signs of depression during her July 2011 physical consultative examination and at that time was not taking any psychotropic medications (*Id.*). The ALJ also stated that Ms. Mangan answered questions at the video hearing without problems with concentration or memory and that Ms. Mangan's mother thought she followed instructions well (R. 26). At the end of her discussion of Ms. Mangan's mental health, the ALJ noted that Ms. Mangan started taking bupropion for depression in January 2012, but concluded that Ms. Mangan's mental health did not warrant any limitations in her RFC (*Id.*).

---

[9] The ALJ first addressed Ms. Mangan's mental health impairment after she addressed Ms. Mangan's physical impairments under Steps 2 and 3.

The ALJ then determined that prior to July 1, 2012, Ms. Mangan had the RFC to perform sedentary work, with some additional postural, manipulative and environmental limitations (R. 26). In support of this determination, the ALJ reviewed the following evidence: (1) Ms. Mangan's mother's report that Ms. Mangan had pain so severe she cannot do household chores; (2) Ms. Mangan's reports that memory loss, severe headaches and chronic pain limited her daily activities to watching television and sleeping, but that she went out daily and drove and shopped occasionally; (3) Ms. Mangan's testimony that she could not lift anything heavier than a box of baby wipes, stand for more than five minutes, walk for more than a block, or sit for more than ten to fifteen minutes; (4) Ms. Mangan's visits in early 2011 with Dr. Tieman; (5) Dr. Russell's physical examination results from July 16, 2011; and (6) Dr. Pula's reports from March 2010, January 2011, August 2011, and February 2012 (R. 27-29). Based on the aforementioned evidence, the ALJ concluded that "there was very limited treatment and presentations for any medical conditions in 2011," and the record did not support Ms. Mangan's alleged limited ability to lift, stand or walk (R. 29).

The ALJ gave Ms. Mangan's testimony only some weight prior to July 1, 2012, because the ALJ stated that her "statements concerning the intensity, persistence and limited effects of these symptoms are not credible . . . to the extent they are inconsistent with the residual functional capacity assessment" (R. 29-30). The ALJ noted that in August 2011, Ms. Mangan reported to Dr. Pula that she had fatigue and numbness in her hands and legs when doing activities, but the ALJ stated that this was inconsistent with "her alleged no activity during the day" (R. 29). The ALJ also found that Ms. Mangan's report in February 2012 that she forgot to pick up her kids belies her claim that she does not do anything during the day but watch television (R. 30). Moreover, the ALJ doubted Ms. Mangan's report to Dr. Pula in February 2012

11

that she fell, because in August 2011, Dr. Pula noted that her balance was "ok" (*Id.*). The ALJ also noted that "despite her various complaints, [Ms. Mangan] did not return for treatment with Dr. Pula until July 11, 2012" after her February 2012 visit (R. 29).

The ALJ gave only "some weight" to Ms. Mangan's mother's report because the ALJ stated that the medical evidence prior to July 2012 did not support that Ms. Mangan was as limited as her mother said (R. 30). In addition, the ALJ gave "little weight" to the letter sent by Dr. Pula to the Illinois Medicaid Office in September 2011 because the letter "does not provide any specific clinical findings to support any work related limitations" (*Id.*). The ALJ also gave little weight to Dr. Rohs' consultative opinion because he "did not have the opportunity to view the entire medical evidence and listen to the claimant's testimony . . ." (*Id.*).

By contrast, the ALJ gave "great weight" to Dr. Jilhewar's testimony because he had the opportunity to listen to Ms. Mangan's testimony, and the ALJ stated that it was "more consistent with the medical evidence of record" (R. 30-31). The ALJ disagreed with Dr. Jilhewar's opinion that Ms. Mangan became disabled in November 2011 because there were no clinical findings to support a worsening condition on that date, but the ALJ agreed with Dr. Jilhewar's alternative opinion that the medical record supported an onset date of July 2012 (R. 31). The ALJ concluded that Ms. Mangan was not disabled prior to July 1, 2012, but that as of July 1, 2012, in light of the MRI evidence and her worsening complaints of fatigue and falls, she met Listing 11.09 for MS (*Id.*).

Ms. Mangan had no past relevant work at Step 4 (R. 31), but at Step 5, the ALJ adopted the VE's opinion that a significant number of sedentary, unskilled jobs existed for a claimant with Ms. Mangan's RFC prior to July 2012 (R. 32). In addition, the ALJ noted that even if she

12

had found that Ms. Mangan's mental health conditions and memory loss were severe enough to warrant additional limitations in the RFC, these jobs would still be available (*Id.*).

## V.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence," *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). That said, deferential review does not mean no review. "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Mangan raises a number of challenges to the ALJ's decision to find her not disabled before July 1, 2012. For the reasons stated below, we agree that errors in the ALJ's analysis of Ms. Mangan's mental impairment and the date that her MS became disabling require remand.

## A.

The record of Ms. Mangan's mental health consists of Dr. Langgut's consultative mental health examination, Dr. Lanier's mental RFC assessment, and various prescriptions for anti-depressant medication and complaints of depression to Dr. Pula. The ALJ failed to adequately address this evidence.

*First*, the ALJ erred when she dismissed Dr. Langgut's diagnosis of mentally deficient intellectual functioning solely on the grounds that it was unsupported by intelligence testing and educational records. Dr. Langgut offered his diagnosis after examining Ms. Mangan and

13

reviewing the medical record. In addition, Dr. Langgut administered oral tests designed to assess Ms. Mangan's memory, computational skills, abstract reasoning and judgment (R. 347-48). Based on these tests, the medical record, and his observations of Ms. Mangan, Dr. Langgut found that she had mentally deficient intellectual functioning (R. 348).

In dismissing that diagnosis, the ALJ did not explain why the oral tests Dr. Langgut administered did not qualify as "intelligence testing." Nor did the ALJ seek further clarification from Dr. Langgut or from a medical expert as to whether the tests Dr. Langgut performed (along with his review of the medical record and his observations) are an acceptable basis for diagnosis. Instead, the ALJ improperly relied on her own medical opinion over that of Dr. Langgut. The ALJ erred in doing so: ALJs must "rely on expert opinions instead of determining the significance of particular medical findings themselves." *Engstrand*, 788 F.3d at 660-61 (quoting *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014)).[10]

*Second*, the ALJ did not adequately address Dr. Lanier's mental RFC opinion. The ALJ discussed Dr. Lanier's finding of moderate limitations in concentration, persistence or pace, and correctly noted that this finding was inconsistent with Dr. Lanier's finding that Ms. Mangan did not have a severe mental impairment. *See Craft*, 539 F.3d at 675 ("If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. Otherwise, the impairment is considered severe . . .") (citing 20 C.F.R. § 494.1520(d)(1)). However, the ALJ failed to mention Dr. Lanier's additional findings that Ms.

---

[10]In addition, the ALJ accepted Dr. Russell's comment during the July 2011 physical examination that Ms. Mangan showed no signs of depression, without explaining why she gave no evident weight to Dr. Langgut's diagnosis in November 2011 that Ms. Mangan had dysthymic disorder -- a form of depression. The ALJ did not address whether, if Dr. Russell was correct, the differing opinion by Dr. Langgut reflected a decline in plaintiff's mental health between July and November 2011. Moreover, ALJs "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008). That is all the more reason that the ALJ was not entitled to gloss over the finding by a mental health professional such as Dr. Langgut, and accept without explanation a different assessment by one who was not a specialist in the field.

14

Mangan had moderate limitations in ADLs and one or two episodes of decompensation of extended duration (R. 70). Instead, the ALJ stated that Ms. Mangan had only mild functional limitations in each Paragraph B category and no episodes of decompensation (R. 25). The ALJ was required to explain why his findings differed on these points from that of Dr. Lanier; the ALJ could not simply disregard contrary evidence. *See Yurt*, 758 F.3d at 860 (the Seventh Circuit has "repeatedly forbidden" ALJs from cherry-picking only the medical evidence that supports their conclusion); *see also Moore*, 743 F.3d at 1124 ("The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record.").

*Third*, the ALJ did not adequately address Ms. Mangan's mental health treatment with Dr. Pula and her lack of treatment from a mental health professional. The ALJ drew an adverse inference from Ms. Mangan's lack of treatment from a mental health professional. However, before drawing such an inference, the ALJ was required to first ask Ms. Mangan why she did not seek such treatment. "It is true that 'infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.' . . . But the ALJ may not draw any inferences 'about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (quoting *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)). As demonstrated by Ms. Mangan's experience with Illinois Medicaid initially denying her coverage for Gilenya, money may have been an issue for her in seeking mental health treatment. The ALJ erred by not seeking explanations for Ms. Mangan's failure to seek treatment from a mental health professional.

15

Moreover, in describing the limited nature of Ms. Mangan's mental health treatment, the ALJ did not fully address Dr. Pula's reports that Ms. Mangan was prescribed several mental health medications. The ALJ acknowledged that Ms. Mangan started taking bupropion for depression, but she did not address Dr. Pula's report that bupropion did not help Ms. Mangan's depression, and that by February 2012, Ms. Mangan had also tried Citalopram and Xanax for depression, to no avail (R. 365). Indeed, by July 2012, Ms. Mangan was getting ready to try a new anti-depressant medication, Cymbalta (R. 398). "The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected. The ALJ in this case presented only a skewed version of the evidence." *Moore*, 743 F.3d at 1123.

These errors in the ALJ's analysis of Ms. Mangan's mental health impairment require remand.[11]

**B.**

Because of our ruling, we need not decide on plaintiff's other challenges to the ALJ's determination. The ALJ will have an opportunity to consider those other challenges on remand. However, we wish to identify an additional matter for the ALJ to consider on remand.

After the ALJ questioned the ME's use of November 1, 2011 as the date Ms. Mangan became disabled from MS, Dr. Jilhewar offered July 11, 2012 as a start date because he was missing the reports from Dr. Pula that preceded that date, and the July 16, 2012 MRI reflected a worsening of Ms. Mangan's MS since 2009. The ALJ assigned the start date to Ms. Mangan's disability as July 1, 2012, in reliance on the alternative date offered by Dr. Jilhewar.

---

[11]The ALJ attempted to minimize the importance of Ms. Mangan's mental health status to the question of disability prior to July 1, 2012, by stating that at Step 5, "[e]ven if [she had] found that claimant's mental health conditions and memory loss was severe enough to warrant additional limitations to unskilled work, the above jobs would still be available" (R. 32). This summary statement does not make the ALJ's errors here harmless. "We are not confident that the ALJ would have reached the same conclusion . . . had she not inappropriately 'played doctor,' ignored possible explanations for [the claimant's] conservative treatment," and ignored evidence in the record that Ms. Mangan was more mentally impaired than the evidence cherry-picked by the ALJ showed. *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *6 (7th Cir. Dec. 3, 2015).

In adopting that date, the ALJ failed to consider that Dr. Pula's reports from August 2011 to July 2012 showed that Ms. Mangan had "gradually experienced worsening health problems" associated with her MS, an illness "which often grows more severe with the passage of time." *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *6 (7th Cir. Dec. 3, 2015). On remand, if the ALJ concludes that plaintiff's MS condition did not render her disabled prior to July 1, 2012, she must better explain the selection of that date. In addition, the ALJ must further address the evidence of plaintiff's mental health status before July 1, 2012, to determine whether that condition (alone or in combination with plaintiff's MS) rendered her disabled prior to July 1, 2012.

## CONCLUSION

For the aforementioned reasons, we grant Ms. Mangan's requested for reversal or remand (doc. # 24) and deny the request of the Commissioner to affirm the denial of disability benefits (doc. # 29). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

DATE: **December 22, 2015**